# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **MARK JONES** ) | |
| **7605 Ordway Court** ) | |
| **Manassas, VA  20112** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No.** |
| ) | |
| ) | |
| **U.S. DEPARTMENT OF DEFENSE,** ) | |
| **1400 Defense Pentagon** ) | |
| **Washington, DC  20301** ) | |
| ) | |
| **and** ) | |
| ) | |
| **DEFENSE INTELLIGENCE AGENCY,** ) | |
| **200 MacDill Blvd.** ) | |
| **Joint Base Anacostia-Bolling** ) | |
| **Washington, DC  20340-5100,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

_____ )

## COMPLAINT

This is an action under the Privacy Act, 5 U.S.C. § 552a, and the Freedom of Information

Act, 5 U.S.C. § 552 (FOIA).  Plaintiff Mark Jones seeks injunctive, declaratory, and other

appropriate relief from Defendants' willful violations of law.  Defendants worked together to

destroy Mr. Jones' finances, career, and reputation and to prevent him from ever obtaining

information to which he is entitled.  That information will confirm Mr. Jones' already well-

substantiated suspicions that Defendants violated the Privacy Act and the FOIA for purposes of

harming him and then covering their tracks.

## THE PARTIES

1. Plaintiff Mark Jones is a citizen of Virginia. From January of 2012 to October 9, 2013, Plaintiff worked for Defendant Defense Intelligence Agency (DIA) as a SAIC/Leidos contract Subject Matter Expert (SME) - Senior Intelligence Analyst.

2. Defendant Department of Defense ("DOD") is an agency of the United States within the meaning of 5 U.S.C. § 552(f)(1). A component of DOD is the Department of Defense Inspector General. (DOD OIG). A component of DOD OIG is the Defense Criminal Investigative Service (DCIS), the investigative arm of DOD OIG.

3. Defendant DIA is a component of DOD.

4. Defendants DIA and DOD have possession, custody and control of the records and information at issue in this complaint.

## JURISDICTION AND VENUE

5. This action arises under the Privacy Act, 5 U.S.C. § 552a, and the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

6. This Court has jurisdiction over the parties and subject matter pursuant to 5 U.S.C. § 552a(g)(5) and 5 U.S.C. § 552(a)(4)(B). Jurisdiction also lies with this Court under 28 U.S.C. § 1331.

7. Venue is proper in this district pursuant to 5 U.S.C. § 552a(g)(5), 5 U.S.C. § 552(a)(4)(B), and 28 U.S.C. § 1391.

## STATEMENT OF THE FACTS

### Mr. Jones' Law Enforcement Background

8. Mr. Jones has a four-decades-long history of patriotic service to the United States military, local, state and federal law enforcement.

9.   Mr. Jones is African-American.

10. Mr. Jones' service began after high school graduation when he enlisted in the U.S. Air Force as a security police-law enforcement officer.

11. In January 1976, after Mr. Jones completed his active duty Air Force service, he became a York County, Virginia deputy sheriff patrol officer, and later that same year, he became a Virginia State Police ("VSP") trooper.  Mr. Jones graduated in the first large class of African-American Virginia State Police.  In 1978, while Mr. Jones was a VSP trooper, he was assigned to VSP's Narcotics Section as a trooper-investigator for one year. That assignment caused him to investigate violent drug traffickers in the Northern Virginia area where he worked a joint investigation with the Drug Enforcement Administration's Washington District Office and the Bureau of Alcohol, Tobacco and Firearms' Washington Field Division. Mr. Jones obtained several drug convictions to include a well-known violent cocaine drug trafficker who had shot another drug trafficker.

12. In March 1982, Mr. Jones left the VSP to join the newly-formed Defense Criminal Investigative Service (DCIS) as a Special Agent (GS-7).

13. In April 1983, after Mr. Jones spent a year with DCIS, the Bureau of Alcohol Tobacco and Firearms (ATF) recruited him as a Special Agent (GS-9).  While at ATF, Mr. Jones completed his few remaining college credits to earn his Bachelors of Science degree and in 1999 obtained his Master's degree.

14. Mr. Jones had a stellar career at ATF.  During his career, he received meritorious promotions over 21 years to Resident in Charge (GS-14), Headquarters Branch Chief (GS-14) and GS-15, Headquarters Supervisory Special Agent and Counterterrorism Liaison to DIA. As a Special Agent (GS-11), ATF trained him – among approximately 30 Special Agents in ATF- to

become an Interstate Firearms Nexus Expert. Mr. Jones was certified as an expert witness before various jurists in the U.S. District Courts in the District of Columbia, Eastern District of Virginia, District of New Jersey, and Eastern District of Pennsylvania through his testimony or written statements.

15. Mr. Jones, while a Special Agent (GS 12 and GS 13) worked violent drug trafficking organizations in the Washington, DC metropolitan area and was the recipient of two Office of the U.S. Attorney for the District of Columbia Certificates of Appreciation on May 12, 1994, at a public ceremony and reception. The awards were for two major firearms and violent drug trafficking investigations in 1992 and 1993. Mr. Jones retired in June 2004.

<u>Mr. Jones' U.S. Navy (Reserves) Background</u>

16. Mr. Jones was commissioned in the U.S. Navy (Reserves) as an Intelligence Officer in June 1987. He served on recalls to active service for Operation Desert Storm (1990) and Operation Enduring Freedom (OEF) (2001). While recalled for OEF active duty in 2001-2002, Mr. Jones received a Navy Commendation Medal and Navy Achievement Medal for his outstanding leadership as an Intelligence Branch Chief for the Commander, Fleet Air Reconnaissance Mediterranean. These medals were presented by a U.S. Navy Rear Admiral during two different awards ceremonies. During his non-active duty periods, Mr. Jones was assigned to various Reserve intelligence billets: operational/fleet; maritime counter narcotics; and counterintelligence. Each year he was ordered to 15-to-30 days active Reserve duty assignments in the United States and/or foreign countries. Mr. Jones retired in July 2007.

<u>Mr. Jones' Overseas Travel</u>

17. While at ATF in January 2003 until June 2004, Mr. Jones had been assigned to DIA's Joint Intelligence Task Force-Combating Terrorism (JITF-CT) as a senior representative for

ATF.  In March to April, and June of 2004, DIA assigned Mr. Jones to travel to Bogota,

Colombia, South America with a JITF-CT team.  ATF secured Mr. Jones an "Official Passport"

(with a different passport number from his personal passport) and temporarily assigned him to

ATF's Bogota, Colombia Office, U.S. Embassy Colombia.  Each trip lasted two or three weeks.

DIA paid Mr. Jones' travel expenses through DIA's travel voucher system.

18. After retiring from ATF, Mr. Jones worked as a Subject Matter Expert contractor for a

DOD non-intelligence position in 2004 for one year, and in September 2005 he worked in the

Intelligence Community until October of 2013.

19. Between September 2005 and October 2013, when (as explained below), Defendants'

malicious and illegal actions effectively forced Mr. Jones out of the  Intelligence Community,

Mr. Jones travelled overseas on Navy orders or vacation from time to time.  All of these trips are

summarized below in paragraphs 20 through 32 of this Complaint.

20. In June 2004, while unemployed because of his recent retirement, Mr. Jones travelled to

Jamaica for vacation.

21. In June 2005, while employed at Computer Science Corporation (CSC) in Crystal City,

Virginia, and assigned to a DOD non-intelligence contract, Mr. Jones travelled by himself to

Jamaica.  Both Jamaica trips were to an all-inclusive resorts.

22. In August 2006, while employed by Lockheed Martin at the DOD Counterintelligence

Field Activity (CIFA) [a disestablished entity that was assigned to the Undersecretary of Defense

for Intelligence] in Crystal City, Virginia, Mr. Jones travelled to the Bahamas on a vacation

cruise after being given approval by CIFA.

23. On April 5, 2007, Mr. Jones received his U.S. Navy (Reserves) orders for assignment and travel to Thailand for three weeks to support a Navy counterintelligence/counter terrorism mission for the Naval Criminal Investigative Service (NCIS).

24. In August 2007, while still employed by Lockheed Martin at CIFA, Mr. Jones travelled to the Bahamas on a vacation cruise after being given approval by CIFA.

25. During Labor Day week of 2008, Mr. Jones, while still working at CIFA as a Lockheed Martin employee, travelled on vacation to Rio de Janiero (Copacabana and Ipanema beaches) with a DIA contractor who also had a part-time job as a night-and-weekend security guard at CIFA (designated herein as "DIA Contractor"), and a contractor for the Department of the Army (designated herein as "Army Contractor").[1] Mr. Jones and DIA Contractor held a Top Secret SCI (Sensitive Compartmented Information) clearance, and the Army Contractor held a Top Secret clearance. Additionally, Mr. Jones had a Counterintelligence Polygraph (CI/Poly), which had been administered by NCIS in April 2005. CIFA approved Mr. Jones' travel. All three men are African-American.

26. In July 2009, Mr. Jones, DIA Contractor, Army Contractor, and a then employee of the National Geospatial-Intelligence Agency (hereinafter designated as "NGA Employee"),[2] travelled to Toronto, Canada to attend the annual Caribana Festival for three days. At the time, Mr. Jones was a Lockheed Martin program manager and was assigned to a Transportation Security Administration (TSA) contract. TSA approved Mr. Jones' travel. NGA Employee is African-American and held a Top Secret/SCI security clearance.

---

[1] For purposes of protecting their personal privacy, the proper names of the DIA Contractor and the Army Contractor are not being disclosed in this pleading. However, Defendants should be able to identify the individuals after reading the entirety of the Complaint.

[2] See n. 1, *supra*.

27. During Labor Day week of 2009, Mr. Jones again travelled on vacation to Rio de Janiero (Copacabana and Ipanema beaches) with DIA Contractor, Army Contractor, and NGA Employee.  TSA approved Mr. Jones' travel.

28. After the Labor Day 2009 trip, Mr. Jones did not have any "unofficial foreign travel."

29. During Labor Day weekend of 2012, while an employee of SAIC/Leidos, and assigned to a DIA contract, Mr. Jones travelled to Costa Rica with DIA Contractor, Army Contractor, and NGA Employee.  DIA Counterintelligence and Security (CI/SEC) and Mr. Jones' DIA government Task Manager approved his travel.

30. In April of 2013, Mr. Jones, while an SAIC/Leidos employee working at DIA, travelled alone to Sosua, Puerto Plata and Caberete, Dominican Republic beach resort areas.  DIA CI/SEC and the DIA government Task Manager approved the trip.  This trip occurred after the initiation of the DIA, DCIS and Drug Enforcement Administration (DEA) investigations (discussed below) starting on or about March 15, 19, and 29, 2013, respectively.

31. In August 2013, Mr. Jones, while an SAIC/Leidos employee working at DIA, travelled alone to a Punta Cana, Dominican Republic all-inclusive resort.  DIA CI/SEC and the DIA government Task Manager approved the trip.  This trip was after the initiation of the DIA, DCIS and DEA investigations.

32.  In late August 2013, DIA CI/SEC and the DIA government Task Manager granted Mr. Jones' request for approval to travel to Sosua, Puerto Plata, and Caberete, Dominican Republic beach resort areas on October 10-14, 2013.  DIA Contractor, Army Contractor, and NGA Employee also had planned this same trip; however, DIA Contractor and Army Contractor were going to travel a few days before Mr. Jones.  As it turns out, Mr. Jones did not go on that trip.

33. A request for "unofficial travel" (vacation) to CIFA and DIA requires the following information: (1) Round trip departure and arrival airport; (2) airline carrier with round trip flight numbers; (3) temporary physical address and phone number where staying in the foreign country; (4) dates of travel; and (5) if staying at a foreign national's residence, all information related to that person.

34. Mr. Jones never stayed at a foreign national's residence.

35. Mr. Jones' travel requests were always submitted weeks to months in advance of his travel.

36. Mr. Jones included his "unofficial travel" vacation trips from 2004 through 2009 on his updated SF 86 Background Investigation forms in November 2010 for his five-year OPM background investigation update.

37. It is untrue that Mr. Jones, at any time between 2004 and October 2013, took any "unofficial travel" to Panama, Thailand or Colombia.

38. Yet, a statement appears in a DCIS Report of Investigation (#2013001078-29-March-2013-60AX-Y0\D), written by Special Agent David Baker and dated June 17, 2014, that an agent in DIA's Investigations Section [CI/SEC-SE-4] told the DCIS Special Agent on March 15 and 19, 2013, that Mr. Jones and five other individuals (names redacted) had made such trips and that Mr. Jones' trips were related to drug trafficking.  The Report stated that DIA had counterintelligence/counterdrug concerns.

39. The DIA CI/SEC SE-4 agent referenced in the DCIS Report of Investigation is either Supervisory (Supvr) Special Agent Paul Oberle, Special Agent Sarah Pinto, or both of them. They are assigned to the DIA's Counterintelligence and Security-Investigation Division's

Virginia Field Office.  DIA CI/SEC-4 personnel also includes the DIA CI/SEC division chief

and Senior Executive Service (SES) deputy director and director.

40. DIA CI/SEC SE-4 knew that Mr. Jones did not, at any time between 2004 and October

2013, take any unofficial trips to Panama, Thailand or Colombia.

41. Regarding two of the named individuals (redacted) who purportedly travelled with Mr.

Jones, Mr. Jones does not know them, nor had he travelled with them at any time.

42. Mr. Jones was a target of the DCIS investigation because the DIA CI/SEC SE-4 agent

gave information about Mr. Jones to the DCIS Special Agent that he or she knew to be false.  In

addition, DIA CI/SEC SE-4 personnel told Special Agent Baker that Mr. Jones may have

"inappropriately charged time used for this unsanctioned activity to the U.S. Government for

payment."

43. Furthermore, this same information was presented to Special Agent Asia Webb, DEA, on

March 19, 2013.  Special Agent Webb was not invited to the March 15, 2013 meeting that

resulted in DEA investigation #GD-13-0156.  According to the DEA Report of Investigation, the

basis for the investigation was "regarding the frequent (not mission related) suspicious

international coinciding flights of current DIA contractors . . .  Jones . . . ." (five other names

redacted).  The DIA CI/SEC SE-4 agent gave this information about Mr. Jones to DEA Special

Agent Webb knowing it to be false.

44. DIA CI/SEC SE-4 personnel made unauthorized disclosures of Mr. Jones' Experian

credit report as his credit history report activity shows retrievals by DIA on March 11 (two

requests) and March 19, 2013. The March 11, 2013 requests were made on the same week as the

March 15, 2013 meeting with DCIS and NGA Office of Inspector General personnel, and the

March 19, 2013 request was on same day of the subsequent meeting with DCIS, the NGA Office

of the Inspector General, and DEA.

 Events Leading to DIA's Willful Destruction of Mr. Jones' Finances and Employment Prospects

45. In January 2012, SAIC/Leidos hired Mr. Jones as a Subject Matter Expert to work on

DIA's Information Technology (IT) contract supporting Targeting Analysis at DIA headquarters,

Washington, DC.

46. DIA CI/SEC SE-4 knew that in January 2012, Mr. Jones was approved by DIA security

personnel to work at DIA headquarters and that his clearance information was current because of

a five-year OPM background investigation completed in May 2011.

47. DIA CI/SEC SE-4 knew that between April 5 and 20, 2012, Mr. Jones passed his five-

year update Counterintelligence polygraph (CI Poly) test administered by DIA CI/SEC

polygraph examiners.  Counterintelligence polygraph questions are open-ended and broad and

include the following subjects: (1) espionage; (2) sabotage; (3) unauthorized disclosure of

classified information; (4) unauthorized contacts with foreign nationals;  (5) deliberate damage to

or malicious misuse of a U.S government or defense system; and (6) terrorism.

48. During his April 2012 DIA CI/SEC CI Poly in Springfield, Virginia, Mr. Jones was

extensively questioned regarding his voluntary disclosure during the CI Poly pre-test that he

became acquainted with a Brazilian female foreign national during his Labor Day 2009 trip to

Rio de Janeiro.  Mr. Jones did not extend a personal relationship beyond that trip and has not

visited Rio de Janeiro since. Mr. Jones passed his CI Poly.

49.  Mr. Jones' security clearance information in the Joint Personnel Adjudication System

(JPAS), provided on July 7, 2016, by the Defense Manpower Data Center's Personnel

Security/Assurance Division, reflects: "Eligibility: Loss of Jurisdiction, 2014 05 19"; Polygraph:

2005 03 21, NCIS, Counterintelligence, 9PN21Mar05.  The Investigation and Adjudication

History section reflects in the first three entries:

[1] "PSI Adjudication of SBPR 1120183549 OPM, Opened 2010 12 06, Closed 2011 05 20,

determined Eligibility Loss of Jurisdiction on 2014 05 19;

[2] "Recertify Eligibility Adjudication of SBPR OPM, Opened 2010 12 06, Closed 2011 05

20, determined Eligibility of SCI-DCID 6/4 on 2013 03 11"; and

 [3] "PSI Adjudication of SBPR 1120183549 OPM, Opened 2010 12 06, Closed 2011 05 20,

determined Eligibility of SCI-DCID 6/4 on 2012 04 20 Rational: No security issues

developed during travels b/t 2004 & 2009."

50. DIA CI/SEC SE-4 knew that while Mr. Jones worked for DIA he complied with the

requirement of obtaining approval from DIA CI/SEC for any foreign personal travel he was

planning to take.

51. DIA CI/SEC SE-4 and DCIS had access to Mr. Jones' JPAS record and were aware that

in his JPAS record he had no "foreign travel issues" for the same "unofficial foreign travel"

during which DIA CI/SEC SE-4 alleges that Mr. Jones "exhibited patterns of suspicious

unofficial foreign travel that initially sparked counterintelligence/counterdrug concerns" as

reported in the DCIS' July 17, 2014 investigative report.

52. DCIS Special Agent Baker took the unusual step of purposely not listing Mr. Jones'

"unofficial foreign travel" dates in his investigative report.  Special Agent Baker knew that such

a list would flag the falsity of any allegation that Mr. Jones was involved in "drug trafficking."

He knew that such dates were the same dates of travel that had been resolved by DIA CI/SEC's

CI Poly.  Additionally, such a listing would have included trips that the DIA Contractor and the

Army Contractor made before Mr. Jones knew them, along with other "unofficial foreign travel" they took without Mr. Jones.

53. Because of budget cuts on the SAIC/Leidos' DIA IT contract, in September 2012, Mr. Jones was transferred from the DIA IT contract to a SAIC/Leidos regional office to work on special projects. DIA CI/SEC SE-4 knew, through DIA's electronic access system, that between September 2012 and December of 2012, Mr. Jones entered the DIA building once with a SAIC/Leidos manager for a meeting but he did not access classified information systems.

54. Beginning in mid- December 2012, Mr. Jones was assigned to a new SAIC/Leidos DIA Counter-Narcotics Trafficking Office IT contract as a Subject Matter Expert.

55. While working at DIA, Mr. Jones had a unique DIA identifier and PKI certificate, to which DIA CI/SEC SE-4 had access.

56. DIA CI/SEC SE-4's monitoring of Mr. Jones' unique DIA identifier and PKI certificate would have shown DIA CI/SEC SE-4 that during all of his task assignments, Mr. Jones accessed only classified information related to his assigned tasks, and did not access Counter-Narcotics, Targeting or Counterintelligence information regarding any place he traveled to or planned to travel to on vacation or any places to which the five other individuals had traveled.

57. In March 2013, DIA CI/SEC SE-4 asked DCIS and DEA to investigate Mr. Jones, DIA Contractor, Army Contractor, and NGA Employee for alleged drug trafficking. DIA CI/SEC SE-4 also asked for an investigation of two white males who worked as DIA Contractors.

58. The two white men had travelled on vacations with DIA Contractor, but never with Mr. Jones. Moreover, Mr. Jones does not know these two individuals.

59. DIA CI/SEC SE-4's main target for the drug trafficking investigation was DIA Contractor because of his extensive "unoffical foreign travel." Previous DIA CI/SEC investigations of the DIA Contractor failed to yield security violations.

60. DIA CI/SEC SE-4 intentionally excluded its own Office of Inspector General (DIA OIG) from the investigation and called on DCIS, instead, to conduct an investigation of 18 U.S.C. 798, Disclosure of Classified Information; 18 U.S.C. 1001, False Statements; 18 U.S.C. 287, False Claims, and 18 U.S.C. 1030, Fraud and Related Activity in Connection with Computers.

61. DIA CI/SEC SE-4 did not call on the DIA OIG to participate in the investigation even though it would routinely be involved in such investigations (See www.dia.mil). The reason why DIA CI/SEC excluded DIA OIG from participation is that DIA CI/SEC SE-4 knew that it was basing its allegations and investigation of Mr. Jones on information in its records about Mr. Jones' travel and work activities that DIA CI/SEC knew to be false. DIA CI/SEC SE-4 did not want to get caught red-handed by its own Inspector General.

62. On October 9, 2013, while Mr. Jones was working at DIA headquarters, he was approached by DIA CI/SEC SE-4 Special Sarah Pinto and DCIS Special Agent Baker near his work space. They escorted him to a DIA Security Office, where DEA Special Agent Asia Webb was waiting. Mr. Jones was told by Special Agent Webb that he was a "target of a drug investigation" and the interview concerned an allegation that the DIA Contractor (then a DIA contractor who worked in Tyson's Corner, Virginia), was suspected of being associated with a foreign female drug trafficker. DIA Contractor had extensive foreign travel.

63. Mr. Jones immediately denied any knowledge of any drug trafficking offenses and stated that any travel with DIA Contractor was a "mancation" (a term Mr. Jones and others used for men on vacation). Mr. Jones explained that his travels were to resort areas where they partied,

socialized, went to the beach and visited night clubs-- restaurants which at night served dinner and later in the evening played music, and that locals also attended.  These establishments were along the Rio de Janeiro Copacabana beach area and heavily patrolled by the Rio de Janeiro tourist police.  Mr. Jones denied that trips to Colombia and Thailand were vacations and he explained that they were related to "official Government 'TDYs.'" This statement was not recorded in Special Agent Baker's report, even though it would had refuted allegations that Mr. Jones had traveled to Colombia and Thailand on "unofficial foreign travel." Special Agent Baker was the only person taking notes.

64. Immediately after Mr. Jones' interview ended, DEA Special Agent Webb cleared Mr. Jones and said that he was no longer a drug trafficking target and that he would so notify the U.S. Attorney's Office

65. Also after the interview, Special Agent Baker left the room to bring in DIA CI/SEC SE-4 Supvr Special Agent Paul Oberle and Special Agent Sarah Pinto, and then Special Agents Baker and Webb left the room.

66. Supvr Special Agent Oberle told Mr. Jones that he was taking Mr. Jones' DIA credentials and escorting him out of the building.  When Mr. Jones asked why, Supvr Special Agent Oberle said it was because of the DEA investigation.

67. At Mr. Jones' request, Supvr Special Agent Oberle brought Special Agents Webb and Baker back into the interview room.  Special Agent Webb reiterated that Mr. Jones was no longer a target of a drug trafficking investigation.  He, again, cleared Mr. Jones of all drug trafficking allegations.

68. Special Agent Baker acknowledged that he had no evidence on Mr. Jones but that he would keep Mr. Jones as a target for future investigation because of "the Snowden effect." Special Agent Baker did not explain what that meant.

69. Supvr Special Agent Oberle and Special Agent Pinto escorted Mr. Jones to his work space to gather up his personal belongings and falsely informed Mr. Jones' government Task Manager that Mr. Jones was the target of a drug trafficking investigation.

70. After escorting Mr. Jones outside of the DIA building, Supvr Special Agent Oberle said he would be waiting for reports from DEA and DCIS and expected to receive them by the end of October 2013 to finish resolving the matter.

71. Despite the lack of evidence that Mr. Jones engaged in drug trafficking, and despite DEA Special Agent Webb's expressed exoneration of Mr. Jones, on October 9, 2013, DIA CI/SEC SE-4 denied Mr. Jones any further access to his office at DIA and, thus, to any classified information that he needed to perform his contracting job.

72. On October 10, 2013, Mr. Jones met with his employer, SAIC/Leidos.  SAIC/Leidos informed Mr. Jones that it would have to lay him off effective 30 days from then.  The reason provided for the layoff was Supvr Special Agent Oberle's false representation to Mr. Jones' government Task Manager that Mr. Jones was the target of a drug trafficking investigation. However, Mr. Jones remained employed until December 12, 2012, when the SAIC/Leidos Facility Security Officer (FSO) logged him out of JPAS with no negative notation in his JPAS file.

73. DIA CI/SEC SE-4 Supvr Special Agents Oberle and Special Agent Pinto knew that they were applying to Mr. Jones a technique of causing an individual to immediately lose his

contracting job by removing him from the building and, on May 24, 2014, placing a "Loss of Jurisdiction" designation on Mr. Jones' name in JPAS.

74. On April 14, 2014, the DOD OIG issued a report entitled "An Assessment of Contractor Personnel Security Clearance Processes in the Four Defense Intelligence Agencies." ("DOD OIG Report").  The report found that DIA's Office of Security regularly evaded personnel security adjudication and due process procedures for contractors alleged to have engaged in misconduct. It found that DIA's Office of Security violated Executive Orders 10865 and 12968 and also DOD Directive 5220.6.  The DOD OIG found that DIA's Office of Security used "a creative variation on this theme."  Specifically, DOD OIG found that DIA's Office of Security "terminated [contractors'] physical access to DIA facilities by confiscating their security badges and having DIA police escort them from the facility."  DOD OIG Report at 24-25. Although Mr. Jones was cleared by DEA on October 9, 2013 (verbally) and November 18, 2013 (written report), DIA CI/SEC SE-4 Supvr Special Agent Oberle used this same technique on him.

75. One month after the DOD OIG issued its report, DIA CI/SEC placed a "Loss of Jurisdiction" on Mr. Jones' name in JPAS on May 24, 2014.  It did so based on its open and, what it knew to be, unsubstantiated, investigation of Mr. Jones for drug trafficking.  In so doing, DIA violated Executive Orders 10865 and 12968, DOD Directive 5220.6, and basic principles of due process.

76. The DOD OIG report explained that if a prospective employer saw a "Loss of Jurisdiction" in JPAS, it knew to contact DIA's Office of Security—where Supvr Special Agent Oberle and Special Agent Pinto worked-- for further instructions.  DOD OIG Report at 25. However, DIA CI/SEC SE-4 knew that no adjudicative determination would be made by DIA's Central Adjudicative Facility (CAF) because of DIA CI/SEC SE-4 Supvr Special Agent Oberle's

and Special Agent Pinto's baseless decision to keep DIA's Security Investigation of Mr. Jones

open indefinitely, even though Mr. Jones has not worked at DIA since October 2013.

77. DIA rejected DOD OIG's criticisms of its practice of evading proper adjudication

procedures and due process.  DOD OIG Report at 25.

78. DIA CI/SEC SE-4 Supvr Special Agents Oberle and Special Agent Pinto knew that their

actions were unjustified and that they would cause Mr. Jones immediate, long-term and severe

financial and future employment harm.  These harms have prevented Mr. Jones from obtaining

employment in his specialized skills as a Subject Matter Expert in counterintelligence, counter

narcotics, counterterrorism.

79. DIA CI/SEC Supvr Special Agents Oberle and Special Agent Pinto knew that with a

"Loss of Jurisdiction" and an open security investigation on Mr. Jones' security clearance, no

company would hire Mr. Jones to perform work at DIA or non-DIA agencies and also that his

clearance could not be passed to another Government agency, which required the TS/SCI or

TS/SCI CI Poly for adjudication.

80. Mr. Jones' position at SAIC/Leidos paid him $128,000 per year.  In addition, he receives

Civil Service and U.S. Navy retirements.  These incomes provided disposable income enabling

Mr. Jones to travel to many locations.  Moreover, these retirements were listed on Mr. Jones'

OPM Background forms, to which DIA CI/SEC SE-4 had access.

81. In fact, all potential offers for non-DIA contracting positions that Mr. Jones received

were subsequently withdrawn because of the damage that DIA caused to Mr. Jones' security

clearance.

82. In October of 2013 and early in November of 2013, then counsel for Mr. Jones, Nicole

Smith of Tully Rinckey PLLC, contacted Supvr Special Agent Oberle about the status of DIA's

investigation of Mr. Jones.  Supvr Special Agent Oberle said he was awaiting reports from DCIS and DEA.

83. On November 17, 2013, DEA Special Agent Webb told Mr. Jones that DEA was not providing DIA CI/SEC SE-4 a report, and that DIA CI/SEC SE-4 knew that.  Furthermore, Special Agent Webb informed Mr. Jones that the DEA investigation was initiated based upon a request from DIA and that DEA could not substantiate the DIA's information on a foreign female's connection to drug trafficking.  The DEA report, which DEA never turned over to DIA CI/SEC SE-4, reflected that DEA had asked DCIS and DIA CI/SEC SE-4 to provide DEA with their investigative reports so that DEA could close its investigation.

84. A DEA report dated November 18, 2013 reflected that DEA requested DCIS and DIA investigative reports.  A February 19, 2014 DEA report indicated that DEA again asked DIA CI/SEC SE-4 for its administrative investigative reports on February 18, 2014.  DIA CI/SEC SE-4 failed to provide them and DIA CI/SEC SE-4 either encouraged or pressured DEA to keep its investigation of Mr. Jones open despite the complete lack of evidence against him.  Further, the DIA CI/SEC SE-4 Special Agent stated that "there was still one pending interview of Mark Jones."  DIA CI/SEC SE-4 never had any intention to interview Mr. Jones.  Doing so would have exposed information to Mr. Jones that he would know, based upon his investigative and counterintelligence experiences, to be false or intentionally misleading.  DIA CI/SEC-SE 4 knew that if Mr. Jones was given an interview, he would have had an opportunity to correct the investigative report.   DIA CI/SEC SE-4 did not want a corrected investigative report because he or she knew that an accurate investigative report would have exonerated Mr. Jones.

85. In December 2013, attorney Nicole Smith contacted Supvr Special Agent Oberle once more.  After Supvr Special Agent Oberle told Ms. Smith that he was still waiting for reports

from DCIS and DEA, Ms. Smith got Supvr Special Agent Oberle to admit that he knew his statement about waiting for a report from DEA was false.

86. On June 28, 2014, Mr. Jones learned from a prospective employer that DIA placed a "Loss of Jurisdiction" designation on Mr. Jones' JPAS file of his security clearances. As DIA CI/SEC SE-4 is fully aware, a "Loss of Jurisdiction" on JPAS is a red flag for prospective employers and it prevents, or makes it extremely difficult, for an individual with a security clearance to obtain another position requiring access to classified information.

87. On June 28, 2014, Ms. Smith contacted DIA CI/SEC SE-4 Special Agent Pinto who told her that DIA CI/SEC SE-4 had not yet received the DCIS report. Special Agent Pinto also said that Mr. Jones walked out of a DIA CI/SEC interview. Ms. Smith corrected Special Agent Pinto, pointing out to her that the event never happened and that Mr. Jones has never been interviewed.

88. DIA CI/SEC SE-4 Special Agent Pinto knew it was untrue that Mr. Jones had walked out of a DIA CI/SEC interview. As Special Agent Pinto knew, DIA CI/SEC had never interviewed Mr. Jones nor asked him to come to an interview as part of DIA CI/SEC's purported investigation of him. The DIA Contractor was interviewed by DIA CI/SEC SE-4 in November 2013, a few weeks after the unannounced October 9, 2013 DEA/DCIS meeting with Mr. Jones. The DIA Contractor walked out of the interview.

89. Between June 28, 2014, and July 20, 2014, Ms. Smith made numerous attempts to contact DCIS Special Agent Baker, his immediate supervisor, Assistant Special Agent in Charge, and the Special Agent in Charge with negative results. When Special Agent Baker returned her call he said that his report had not been finalized by his supervisor and it would be issued after his approval.

90.  Even though DCIS's eight-page investigative report is dated June 17, 2014, it was not issued and distributed to DIA SE-4, DIA OIG, DEA, NGA OIG, the U.S. Attorney's Office, Eastern District of Virginia, the FBI, U.S. Army Contracting Command, the Department of Defense Central Adjudication Facility, and other agencies until after July 21, 2014.

91. Mr. Jones did not receive the report until August 6, 2014, after DOD IG FOIA mailed it to him on August 1, 2014, in response to his Privacy Act and FOIA request.

92. On September 29, 2014, DIA CI/SEC SE-4 Special Agent Pinto finally acknowledged to Ms. Smith that she had received the DCIS report, and that her boss had received her rough draft of the DIA CI/SEC SE-4 investigative report, which she expected to go to Personnel Security within the next several weeks.

<u>The DCIS Report was Based on Information in DIA's Records about Mr. Jones that<br>DIA Knew to be False</u>

93.  Nine months elapsed between October 9, 2013, when DCIS Special Agent Baker told Mr. Jones he would keep his investigation of Mr. Jones open, and when Special Agent Baker issued his eight-page Report of Investigation.

94. Special Agent Baker was unable to find any evidence of the allegations he initiated against Mr. Jones.  Specifically, he found no evidence that Mr. Jones illegally disclosed classified information, made false statements, made false claims, or engaged in computer fraud.

95. The DCIS report stated that a DIA CI/SEC SE-4 agent (labelled "SE-4") told Special Agent Baker that Mr. Jones took personal trips to Brazil, Colombia, Thailand, Costa Rica, the Dominican Republic, and Panama.

96. DIA CI/SEC SE-4 Supvr Special Agent Oberle and Special Agent Pinto knew that Mr. Jones traveled to Colombia and Thailand only on official TDY's, had not traveled to the

Dominican Republic by the time the investigation started (March 2013), and had never traveled to Panama.  Nonetheless, that is what DIA CI/SEC SE-4 told Special Agent Baker.

97. Special Agent Baker and DIA CI/SEC SE-4 Supvr Special Agent Oberle and Special Agent Pinto knew that Mr. Jones obtained DIA CI/SEC approval for all of the trips he took to foreign countries while working for DIA and CIFA.  Yet, this exculpatory evidence is reflected nowhere in DCIS's Report of Investigation.

98. Special Agent Baker and DIA CI/SEC SE-4 knew that Mr. Jones accessed only classified information related to his assigned tasks at DIA and did not access Counter-Narcotics, Targeting or Counterintelligence information for any place he traveled to on vacation.

99.  During the course of the investigation and sometime before the October 2013 interview, DCIS Special Agent Baker realized that he would be unable to support any of the charges against Mr. Jones and that the DEA investigation would yield a clearance for Mr. Jones.  Special Agent Baker repurposed the DCIS investigation in an attempt to connect Mr. Jones to human trafficking.  To support a human trafficking charge, Special Agent Baker claimed that Mr. Jones concurred when he suggested to Mr. Jones that he "picked up girls and prostitutes with no ill intent."

100.      It is untrue that Mr. Jones "picked up girls and prostitutes" on any of his travels. The only foreign female that he befriended was in Brazil, and Mr. Jones discussed and resolved this matter during his April 2014, DIA CI/SEC CI Poly.

101.      It is untrue that Mr. Jones admitted to Special Agent Baker that he picked up prostitutes during his travels. Specifically, Mr. Jones told Special Agent he did not meet prostitutes.

102.      Special Agent Baker knows that Mr. Jones did not admit to having picked up any prostitutes.  Special Agent Baker lied in order to make it appear that Mr. Jones engaged in inappropriate conduct and in an attempt to justify to his DCIS supervisor his investigative hours while assigned to this investigation and the taxpayer dollars he wasted on investigating Mr. Jones.

103.      It is untrue that Mr. Jones traveled to the Dominican Republic with DIA Contractor, Army Contractor or NGA Employee at any time, contrary to what is indicated in the DCIS investigative report.  During the DEA/DCIS interview on October 9, 2013,  DEA Special Agent Webb inquired about the upcoming Columbus Day 2013 trip to the Dominican Republic (DIA CI/SEC approved this trip in August 2013).  Mr. Jones responded that he, DIA Contractor and others were attending a "singles weekend event" in the Dominican Republic.  Mr. Jones never took this trip.

104.      In August of 2014, Mr. Jones filed a formal integrity complaint against DCIS Special Agent Baker with the DOD OIG- Internal Review Division, investigation #20140022559-25, SEP-14-IRD-FF1-23.  In the complaint, Mr. Jones provided a detailed recorded statement that chronicles the numerous inaccuracies in Special Agent Baker's report, his false attributions of statements to Mr. Jones, his failures to consider known and verifiable exculpatory evidence, and other examples of reckless, slanted, and biased fact finding.  Mr. Jones also complained that Special Agent Baker's unexplained nine-month delay in issuing the report was intended to support and cause the DIA CI/SEC SE-4 investigation to remain open, thereby negatively impacting Mr. Jones' security clearance.  Mr. Jones complained that this was a violation of the DCIS reporting standards and contrary to the Council of the Inspectors General of Integrity and Efficiency's report titled "Quality Standards for Investigations," dated

November 15, 2011, pp 8, 9, 12, 13 and 14.  Mr. Jones was one of three people that filed a complaint against Special Agent Baker in this investigation.

### DIA Caused DEA to Create a False Investigation Report (Record) about Mr. Jones

105.     According to DEA Special Agent Webb's report #GD-13-0156, prepared on March 19, 2013, "On March 19, 2013 Special Agent [name redacted] was briefed by Defense Intelligence  (DIA) SAs [names redacted] regarding the frequent (not mission related) suspicious international coinciding flights of current DIA contractors [names redacted] and Mark Jones." According to the DCIS report 2013001078-29-March-2013-60AX-Y0\D, "DEA agreed to conduct a joint investigation with DCIS, SE-4 and NGA-OIG with DEA as the lead agency."

106.     DIA CI/SEC SE-4 Special Agents provided false information to DEA Special Agent Webb at the March 19, 2013 meeting leading him to believe that Mr. Jones was part of a drug trafficking organization.  This information caused Special Agent Webb to list on the DEA's Personal History Report that Mr. Jones as a "Leader Within Org," worked at "Defense Intelligence Agency Tyson's Corner, VA USA" and controlled substance "C1-Cocaine HCL"

107.     It is untrue that Mr. Jones was a "Leader Within Org;" he never worked or visited the "Defense Intelligence Agency, Tyson's Corner, VA USA," and was not involved in controlled substance "C1-Cocaine HCL" or any drug transaction or aware of same.  Furthermore, Mr. Jones has never been a member in any criminal organization or criminal activity.  In addition, Mr. Jones never had coinciding flights with five individuals (names redacted) or knowledge of all five individuals.

108.     At the conclusion of the DEA investigation, Special Agent Webb refused to provide DIA CI/SEC SE-4 personnel a copy of his investigative report.  That is because Special

Agent Webb knew that the information about Mr. Jones provided by DIA CI/SEC SE-4 was knowingly false.

<u>DIA's Deceitful Actions and Intentional Withholding of Information about its Actions</u>

109.    To this day, DIA CI/SECSE-4 Supvr Special Agent Oberle and Special Agent Pinto have not interviewed Mr. Jones and yet they claim that a DIA CI/SEC investigation of him exists and has remained open for more than three years.

110.    Since October 2013, Mr. Jones and his attorneys have asked DIA CI/SEC Supvr Special Agent Oberle and Special Agent Baker at least a dozen times about the status of its open security investigation and when the report would be finalized.  Moreover, Mr. Jones' Privacy Act and FOIA requests to DIA have continuously been denied based on a purportedly open investigation.  His Privacy Act and FOIA requests also include a request for the Incident Report that justified the "Loss of Jurisdiction."  DIA has yet to produce it.

111.    On October 15, 2015, Attorney Robert P. Watkins of Tully Rinckey, PLLC, then counsel for Mr. Jones, phoned Supvr Special Agent Oberle.  Supvr Special Agent Oberle assured Mr. Watkins that reporting on Mr. Jones would "close out" no later than December of 2015. Supvr Special Agent Oberle never explained why he held on to the DIA CI/SEC investigative report since September 29, 2014, or never closed the investigation.

112.    Supvr Special Agent Oberle knew that Mr. Jones' TS/SCI Access and CI polygraph access would expire in December 2015, because they would have been inactive for two years.  That is, by December 2015, Mr. Jones would not have been employed in a TS/SCI or TS/SCI CI Poly position for two years. That was one reason motivating Supvr Special Agent Oberle's delay in issuing the DIA CI/SEC investigative report.  Additionally, with an open

Security Investigation, a prospective employer could not have Mr. Jones' clearance re-adjudicated with the DOD Central Adjudication Facility (DODCAF) or any Government agency.

113.     On November 17, 2015, Mr. Watkins sent an email to Brentin Evitt, DIA Deputy General Counsel for Mission Services, Science & Technology, expressing his concern about any additional delay in DIA CI/SEC's issuance of its report and the present harm and additional harm it would cause Mr. Jones.

114.     Mr. Evitt replied to the email on November 20, 2015, by opining that removing the "Loss of Jurisdiction" "is the best course of action."  Mr. Evitt promised to have DIA move quickly towards a decision.  After Mr. Watkins heard nothing further, his emails and phone calls to Mr. Evitt were left unanswered.

115.     In his November 20, 2015 email Mr. Evitt stated "This does not change the fact that this agency had very good [unidentified] reason to conduct an investigation.  But, it did not conclude in any adverse action on our part."

116.     In the above-quoted statement, Mr. Evitt made the following admissions:  (1) that DIA CI/SEC conducted an investigation of Mr. Jones and others associated with the DIA Contractor; and (2) that the investigation came to an end and yet DIA CI/SEC did nothing to correct its unjustified marring of Mr. Jones' security clearance.

117.     However, Mr. Evitt's statement that the investigation did not conclude in "any adverse action" on DIA's part was false.  To date, the "Loss of Jurisdiction" remains in JPAS as does its adverse effect on Mr. Jones.  As set out below, in paragraphs 119 through 127, Mr. Jones has lost many employment opportunities and suffered other harm because of DIA CI/SEC's and DCIS' actions against him.

118.    On June 16, 2016, in response to two emails and two phone messages from Rosa M. Koppel, one of Mr. Jones' current attorneys, Mr. Evitt stated that he would check with DIA regarding what actions they took or did not take regarding Mr. Jones' security clearance. Since then, Ms. Koppel has not heard back from Mr. Evitt.

<u>Damages to Mr. Jones Caused by DIA CI/SEC's Intentional and Willful Actions</u>

119.    In December of 2013, Mr. Jones lost his position with SAIC/Leidos, which paid him a salary of $128,000 per year. DEA had notified DIA CI/SEC verbally on October 9, 2013, and in its November 18, 2013 investigative report that the drug trafficking allegations against Mr. Jones were unsubstantiated. Mr. Jones still needed his TS/SCI CI Poly clearance during his remaining employment with SAIC/Leidos and for other future potential contract employment opportunities. Other DIA contractors involved in the investigation were interviewed in November 2013; however, interviewing Mr. Jones during this same period would have caused a correction to the DIA CI/SEC investigative report (record) and also triggered the "due process" provision of the security clearance process.

120.    In the summer of 2014, at least two job offers were not extended to Mr. Jones because of the "Loss of Jurisdiction" placed by DIA CI/SEC and the open DIA CI/SEC investigation.

121.    On November 13, 2015, a Department of Homeland Security contractor interviewed Mr. Jones for a TS/SCI Project Leader position at its Arlington, Virginia office. Mr. Jones met with the interview panel and then was immediately referred to the Human Resources specialist to discuss salary and benefits. Later that same day, the company's Facility Security Officer called Mr. Jones for his personal data to query JPAS. The FSO commented that Mr. Jones had a "Loss of Jurisdiction" and that the FSO could not proceed further. The position

would have paid between $115,000 and $125,000 plus benefits.  Mr. Jones was denied the

position because of the "Loss of Jurisdiction" and because the company did not want to undergo

the great burden and difficulty (of which DIA CI/SEC is aware and maintained an open Security

Investigation) of resolving a "Loss of Jurisdiction".

122.     Mr. Jones' TS/SCI Access and CI polygraph results expired in December of 2015,

because they had been inactive for two years by then, because of DIA CI/SEC's actions.  This

expiration also hampered Mr. Jones' efforts to obtain employment in his specialized field of

Subject Matter Expert-Counterintelligence, Counterterrorism and/or Counter Narcotics. TS/SCI

CI Poly positions are higher paying than Secret, Top Secret and TS/SCI.

123.     On February 23, 2016, Mr. Jones, a self-employed sub-contractor to KeyPoint

Government Solutions assigned to work on OPM background investigations, was suspended

because of the "Loss of Jurisdiction" and indication of an open DIA CI/SEC investigation.  This

position only required a TS and not a TS/SCI or TS/SCI CI Poly.

124.     Since December of 2013, DIA CI/SEC SE-4's actions have caused Mr. Jones to

lose more than two-and-one half years' worth of high salary and benefits, and this harm

continues with no end in sight.

125.     There was no legitimate law enforcement or security reason or justification for

DIA to keep its investigation of Mr. Jones open for 40 months and for two years after DCIS

issued its investigative report.

126.     DIA CI/SEC SE-4 placed intentionally false and harmful information about Mr.

Jones in its investigative report (record) that it knowingly provided to DEA and DCIS, and

knows that closure of its investigation would require it to, finally, produce the report and related

materials to Mr. Jones in response to his long-standing Privacy Act and FOIA requests.

127.     Mr. Jones has suffered emotional harm from the false information in DIA CI/SEC's records about his travels that DIA CI/SEC provided to DEA and DCIS for their investigative reports.

Mr. Jones' Requests to Defendants under the Privacy Act and the FOIA

Privacy Act and FOIA Requests to DIA

128.     On July 15, 2014, Mr. Jones made a request to DIA under both the Privacy Act and the FOIA for the documents associated with DIA CI/SEC's investigation of Mr. Jones, DIA Contractor, and others.  Listed among the specific documents Mr. Jones requested were any Incident Report forming the basis for the "Loss of Jurisdiction" status of Mr. Jones' security clearance and any documents that DIA CI/SEC submitted to DEA or DCIS in connection with the DIA CI/SEC, DEA or DCIS investigations.

129.     On July 17, 2014, Alesia Y. Williams, Chief, Freedom of Information Staff, DIA, acknowledged receipt of the request and notified Mr. Jones that DIA would be unable to respond to any part of his request within 30 days due to "unusual circumstances."

130.     On September 11, 2014, Ms. Williams stated that DIA was able to identify a security investigation but that the case was still open.  She explained that, therefore, DIA was denying Mr. Jones' Privacy Act and FOIA requests based on Exemption 7(A) of the FOIA, 5 U.S.C. § 552(b)(7)(A).  Ms. Williams advised Mr. Jones that if he was still interested in obtaining the requested information, he would need to send a new request once the investigation was closed.  The letter did not inform Mr. Jones of any administrative appeal rights.

131.     Not having heard from DIA CI/SEC as to whether the investigation was closed or remained open, on December 20, 2014, Mr. Jones filed a second request under the Privacy Act and the FOIA for essentially the same information he requested on July 15, 2014.

132.     On January 7, 2015, Ms. Williams, then holding the title of Chief, FOIA and Declassification Services Office, DIA, acknowledged receipt of the request and notified Mr. Jones that DIA would be unable to respond to any part of his request within 30 days due to "unusual circumstances."

133.     On July 17, 2015, Ms. Williams stated in a letter that DIA was able to identify a security investigation but that the case was still open.  Ms. Williams explained that, therefore, DIA was denying Mr. Jones' Privacy Act and FOIA requests based on Exemption 7(A) of the FOIA, 5 U.S.C. § 552(b)(7)(A).  Ms. Williams advised Mr. Jones that if he was still interested in obtaining the requested information, he would need to send a new request once the investigation was closed.  Again, the letter did not inform Mr. Jones of any administrative appeal rights.

134.     On November 9, 2015, Mr. Jones sent DIA a third request under the Privacy Act and the FOIA for the same information he had requested in his requests of July 15, 2014, and December 20, 2014.

135.     On November 13, 2015, Ms. Williams acknowledged receipt of the request and notified Mr. Jones that DIA would be unable to respond to any part of his request within 30 days due to "unusual circumstances."

136.     To date, Mr. Jones had received no response to his request of November 9, 2015.

<u>Privacy Act and FOIA Requests to DOD OIG for DCIS Documents</u>

137.     On January 9, 2014, Mr. Jones made a request to DOD OIG under the Privacy Act and the FOIA for the report filed by DCIS Special Agent Baker and all other documents in the DCIS case file.  Mr. Jones sent it by U.S. Postal Service Certified Mail and requested a return receipt.  DOD OIG signed the return receipt on January 17, 2014.

138.     Upon receiving no response from DOD OIG, Mr. Jones resubmitted the request to DOD OIG on June 9, 2014.

139.     On June 30, 2014, Kelly McHale, Government Information Specialist, DOD OIG, denied that DOD OIG received Mr. Jones' January 9, 2014 request.  However, she acknowledged receipt of his follow up request of June 13, 2014.  Mr. Jones' request was assigned case number FOIA-2014-00545.

140.     By letter dated August 1, 2014, Jeanne Miller, Chief, Freedom of Information and Privacy Office, DOD OIG, granted the request in part by disclosing a heavily redacted version of the DCIS report.  Mr. Jones received the DCIS report on August 6, 2014.  DOD OIG denied the remainder of Mr. Jones' request, explaining that the requested case files were part of an open investigation.

141.     Mr. Jones filed an administrative appeal of DOD OIG's decision on FOIA-2014-00545 on August 27, 2014.

142.     In response to an email from Mr. Jones, Ms. McHale acknowledged receipt of the appeal on September 3, 2014.

143.     Not having received a response, on October 30, 2014, Mr. Jones asked Ms. McHale when he could expect a response.  On November 3, 2014, Jason Darelius, the Action Officer assigned to the appeal of FOIA 2014-00545, promised a response by no later than November 10, 2014.

144.     On November 17, 2014, in response to an email from Mr. Jones, Mr. Darelius explained that he could no longer commit to a date by which a response would be sent.  He explained that his office was "working on issues with cases including and similar to your appeal" and that his supervisors "have not been able to provide me with a way to set an estimate."

145.     In response to a request for a status update from Mr. Jones, on January 27, 2015, Mr. Darelius sent an email to Mr. Jones explaining that his office received the documents that Mr. Jones requested and that they would be sent for review by the team chief by the end of the week.

146.     Despite Mr. Darelius' promise that the documents would be produced shortly, Mr. Jones had to follow up again when he had received no response by March 2, 2015.

147.     Having still not heard from Mr. Darelius, Mr. Jones filed a second appeal of FOIA 2014-00545 on July 31, 2015.

148.     Mr. Jones followed up, again, after not receiving a response to his second appeal. On October 9, 2015, Joseph Kasper, FOIA/Privacy/Civil Liberties Office, DOD OIG, replied to Mr. Jones stating that his appeal was "in a que [sic]."  In response, Mr. Jones asked Mr. Kasper how a case can be in a queue when the requested documents were already processed but not produced.  Mr. Kasper did not answer Mr. Jones' question.

149.     On December 9, 2015, Mr. Kasper, in response to an inquiry from Mr. Jones, wrote that the "case has moved to number 2 in the que [sic]."

150.     On June 8, 2016, Mr. Jones sent an email to Mr. Kasper asking him when the requested documents would be produced, noting Mr. Kasper's representation this past December that his request was the second in the queue.  In response, Mr. Kasper explained that there were documents that required consultation with an "outside agency," and that he was awaiting that agency's response.  Mr. Kasper stated further that the "outside agency" would respond directly to Mr. Jones, and that DOD OIG would continue to send periodic reminders to the "outside agency." Mr. Jones' original Privacy Act and FOIA request mentioned the DIA and NGA.  Mr. Jones did receive a response from NGA to NGA FOIA #2016-FOI-00009 on April 11, 2016,

referencing National Geospatial-Intelligence Agency's Combating Trafficking in Persons regulation.  DIA has not provided a response.

151.    On June 9, 2016, Mr. Jones sent an email to Mr. Kasper asking whether the "outside agency" that Mr. Kasper was shielding was DIA.  In his email, Mr. Jones made a FOIA request for the periodic reminders that DOD OIG sent the "outside agency" regarding Mr., Jones' request.  To date, there has been no response or acknowledgment from Mr. Kasper.

152.    To date, Mr. Jones has received no response from DOD OIG from either his initial request from two-and-one-half years ago or from his appeals.

<u>FOIA Request to DOD OIG for Report on Integrity Complaint Against Special Agent Baker</u>

153.    After Mr. Jones filed a formal integrity complaint with DOD OIG against DCIS Special Agent Baker in August of 2014 in connection with his biased investigation of Mr. Jones based on unsubstantiated charges, the complaint was assigned to DOD OIG Special Agent Christopher Cannon for investigation.  On July 29, 2015, Special Agent Cannon informed Mr. Jones by email that his report was complete and could be obtained under the FOIA.

154.    On July 31, 2015, Mr. Jones filed a FOIA request with DOD OIG for a copy of Investigation #2014002259-25, SEP-14-IRD-FFI-23.  Despite his efforts to follow up with the FOIA office, he has not yet received a response to his FOIA request.

<u>FIRST CAUSE OF ACTION</u>
<u>PRIVACY ACT- FAILURE BY DIA TO MAINTAIN ACCURACY</u>

155.    Mr. Jones repeats and re-alleges the allegations contained in paragraphs 8 through 127 above, inclusive.

156.    DIA CI/SEC SE-4 maintained, and provided to DEA and DCIS for use in its investigation of Mr. Jones, information about Mr. Jones' foreign travels and about

counterintelligence/counterdrug concerns that it knew to be false.  DIA CI/SEC knew that DEA and DCIS would rely on that false information to investigate Mr. Jones on allegations of drug trafficking, fraudulent time, false statements and misuse of DOD computers.  DIA CI/SEC knew that these allegations were baseless yet DIA CI/SEC reported them to Mr. Jones' Government Task Manager causing him to lose his contracting job and have a "Loss of Jurisdiction" and open Security Investigation status placed on his security clearance.  As a result, Mr. Jones has lost numerous opportunities to perform contracting work requiring his TS/SCI and TS/SCU CI Poly security and his specialized skill sets in counterintelligence, counterterrorism, and counter-narcotics.

SECOND CAUSE OF ACTION<br>PRIVACY ACT- DIA'S REFUSAL TO PROVIDE ACCESS TO RECORDS

157.     Mr. Jones repeats and re-alleges the allegations contained in paragraphs 128 through 133 above, inclusive.

158.     DIA's refusal to respond to Mr. Jones' request for information on DIA CI/SEC's investigation of him and information on the status of his security clearance violates his rights under the Privacy Act, at 5 U.S.C. § 552a(d)(1) for access to the information.

159.     No exhaustion of administrative remedies is required in order to pursue this claim.

THIRD CAUSE OF ACTION<br>FOIA- DIA'S NONCOMPLIANCE WITH FOIA'S TIMELINESS REQUIREMENTS

160.     Mr. Jones repeats and re-alleges the allegations contained in paragraphs 134 through 136 above, inclusive.

161.      DIA violated the FOIA by failing to respond to Mr. Jones' FOIA request of November 9, 2015, within 30 days after receiving it.

162.     Therefore, Mr. Jones has exhausted his administrative remedies because more than 30 days have elapsed since he filed the request.

## FOURTH CAUSE OF ACTION
## FOIA- DOD OIG'S NONCOMPLIANCE WITH FOIA'S TIMELINESS REQUIREMENTS (REQUEST FOR DCIS DOCUMENTS)

163.     Mr. Jones repeats and re-alleges the allegations contained in paragraphs 137 through 152 above, inclusive.

164.     DOD violated the FOIA by failing to respond to Mr. Jones' FOIA appeal of August 27, 2014, for access to documents concerning DCISs' investigation of Mr. Jones.

165.     Therefore, Mr. Jones has exhausted his administrative remedies because DOD failed to respond to his appeal within 20 work days after receiving it.

## FIFTH CAUSE OF ACTION
## FOIA- DOD OIG'S NONCOMPLIANCE WITH FOIA'S TIMELINESS REQUIREMENTS (REQUEST FOR REPORT ON INTEGRITY COMPLAINT AGAINST DCIS SPECIAL AGENCT BAKER)

166.     Mr. Jones repeats and re-alleges the allegations contained in paragraphs 153 through 154 above, inclusive.

167.     DOD violated the FOIA by failing to respond to Mr. Jones' FOIA request of July 31, 2015, for access to the DOD OIG's report on Mr. Jones's integrity complaint against DCIS Special Agent Baker.

168.     Therefore, Mr. Jones has exhausted his administrative remedies because more than 30 days have elapsed since he filed the request.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Jones respectfully requests that this Court:

(1)  Declare and find that the Defendants intentionally violated Mr. Jones' rights under the Privacy Act and the FOIA;

(2)  Award Mr. Jones monetary damages, in an amount no less than $1,000, but which shall be determined at a later date, for the harm incurred due to Defendant's failure to comply with its obligations under the Privacy Act;

(3)  Declare and find that Defendants' violations of the Privacy Act and the FOIA were unlawful;

(4)  Declare and find that Defendants' violations of the Privacy Act and the FOIA were intentional and designed to cause permanent injury to Mr. Jones and to conceal their violations of Mr. Jones' rights;

(5)  Grant Mr. Jones an award of attorney fees and other litigation costs reasonably incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E)(i), 5 U.S.C. § 552a(g)(4), the Equal Access to Justice Act, or any other applicable law; and

(6)  Grant Plaintiff such other and further relief which the Court deems proper.

Respectfully submitted,

/s/_____

LARRY J. STEIN
D.C. Bar No. 397397

ROSA M. KOPPEL
D.C. Bar No. 405779

Law Offices of Larry J. Stein, LLC
4023 Chain Bridge Road, Suite 6
Fairfax, Virginia  22030
Telephone:  (703) 383-9090
Facsimile:  (703) 424-7670
larrystein@ljslaw.net

Counsels for Plaintiff